This is our 3 o'clock, the People v. Fareed Jackson, 4090157. For the appellant, we have Martin Ryan. In the appellee, we have Anastasia Brooks. Mr. Ryan. I'm Martin Ryan for Appellant 3, Jackson. Essentially, to get down to it, the state's proof of this case, of Mr. Jackson's, of this offense, I would say there's an enormous gap between... Keep your voice up a little bit, please. Yes, sorry, Your Honor. I never get told that I'm too quiet. It is the defense's position that there's a large gap between the state's evidence in this case and what the statute requires for proof, specifically along the lines of knowing possession. In this case, the evidence was that Matthew Wilson was a drug dealer. About 339 individual bags, contained in five a bit larger bags, containing Roloxocrat cocaine, were found hidden in the trunk liner of Mr. Wilson's car, which had stalled on I-55. Mr. Wilson was present. My client, Mr. Jackson, was also there. He admitted that he had been driving the vehicle. Also in the car was Mr. Wilson's girlfriend, Deidre Taylor, who also testified that not only was Mr. Wilson her boyfriend and a drug dealer, but that Mr. Jackson had never before gone with them to Bloomington when Mr. Wilson would travel there to sell drugs. The police respond. The men are outside the car, and they eventually allow the men to get their coats and some other items from the car. Mr. Ryan? Yes. Did you look at the video of the arrest? Yes, I looked at the video. You did? Yes. When the police officer pulls up, do you think there were two men standing outside the car? It's interesting. You know, Your Honor, it looked to me like it might have been more than one, but the officer testified that there were two. Doesn't the video show there was only one? The officer did testify there were two. Okay. You may be right. Well, let's say there's one. He's still outside. He's outside, and he goes back in. The state never asks Ms. Taylor why Mr. Jackson was outside the car. Who is the one person outside the car? The record doesn't show that. I guess that's not clear. It could have been my client. It could have been Mr. Wilson. Even if we assume the best fact for the state that it was my client rather than Mr. Wilson, there is no evidence as to why he's out of the car or what he's doing. There's a number of items in the trunk that apparently are on top of the cocaine in the ruffles bag that's hidden underneath the liner. At any rate, the court, looking at the evidence of this bench trial, in looking at the evidence before it of just the circumstances of the stalled vehicle and what the police found at the time, says this is suspicious, but it's not enough. And the court finds that what put the state over the top in its mind was the testimony of Ms. Taylor. And yet, the only thing that she said that remotely incriminates him in any imaginable fashion is that presumably some hours earlier, as it would take at least that amount of time to get from Chicago to someplace in McLean County to stall an I-55, she sees Mr. Wilson and Mr. Jackson in Mr. Wilson's house or apartment holding about eight very small bags of crack cocaine. And from this, we are to infer that the state has proven beyond a reasonable doubt that because he was there and he admitted to driving the car, that because he had handled a much smaller quantity of crack cocaine, that he must have known, and they proved beyond a reasonable doubt, that he must have known what Mr. Wilson had hidden in the trunk of his car. The Gore case that I mentioned in my brief talks about when you've got more than one person in a car in which police find drugs. And it talks about the driver's liability and proof of the guilt. And it says in cases where the driver has been convicted, there needs to be some sort of showing of special or specific knowledge by the driver of the contents. And there isn't anything here. There's nothing in the record even about who brought out these eight bags of crack that Ms. Taylor saw the two men have, or whether it was ingested at the time. There was no testimony that Mr. Jackson ever discussed or was ever seen loading the trunk, or there was no discussion about any deal. There was no evidence of any discussion about any deal to drive in exchange for drugs. And then on top of that, Mr. Wilson would have disclosed that, by the way, you know you're driving me so I can sell drugs in Bloomington, and I've got a stash hidden back here. What about the usage of the drugs in the car on the way down? You mean the marijuana? That's what got the car searched. My client was apparently smoking marijuana. And he appeared to be under the influence. Of marijuana, yeah. Well, I don't know. Well, they found burnt marijuana in the console, and there was no suggestion that there was any burnt cocaine. Wasn't there evidence that your client smelled? Of marijuana. And that his eyes were red and glassy? Yes. The officer specifically said he smelled like burnt cannabis. He didn't say he smelled like burnt crack. At any rate, the state did not, you know, the defense position that the case is resolvable is the state just didn't prove beyond a reasonable doubt. Whatever standard of review you use, no rational prior fact could say that this beyond a reasonable doubt establishes that But turning to the second issue, the chain of custody issue, you know, the defense's position is that the state failed to make a prime official case that it took reasonable protective measures to prevent tampering or substitution or alteration. The main thing is that we have an unexplained, unlabeled rock of cocaine, or apparent cocaine it looks like, supposedly, that materialized in what was supposed to be a sealed manila envelope. And that's the primary grounds for relief. Now, there's no evidence, or there seems to be some confusion at least, as to who generated the manila envelope, because the officer identifies a red seal that's on that envelope. It's his seal, but he says, I thought I used a plastic bag. I didn't use this container. Now, would you agree, Mr. Ryan, that this record was very difficult to figure out exactly what he's talking about, because he's using it and this and container. And there are multiple containers. We don't know what he's referring to. Yes, I would agree. Did you see the photographs of the bags? Yes, yes. I had the clerk photocopy those to put in the record. Thank you for that. Did you see that his initials are on the bag itself, the manila envelope? I'm going to call it the manila envelope. Actually, I did not. I saw her. Sorry, Ms. Dirkers. Okay, yeah. Right here. Where he signs the sealed tape and it runs right onto the envelope in ink. Ms. Brooks, would you like to approach to see what he's looking at? I'm not seeing it, Your Honor. I'm sorry. Here? Here? Yeah. I see something here. Is that a T? Right, TH and his ID number. Mr. Ryan, do you know were Mr. Jackson's fingerprints found on any of the bags? No evidence was presented to that effect. It was checked, though, was it not? I believe it was. You know what, off the top of my head, Your Honor, I don't remember that being discussed in the record. I thought Ms. Dirkers testified. There's a lab report. Oh, yes. They sent it off. You're right. They sent it off. I didn't focus on it. They sent it off and they couldn't find it. No latent prints found. Yeah, they couldn't find any prints. So, you know, it doesn't say anything one way or the other. At any rate, and then there's also, okay, even given that perhaps maybe Trooper Hartman was mistaken about whether he used the envelope. I'm sorry? It's very confusing because of the way you drafted your brief. Well, I think he's saying he didn't place the individual knotted baggies into the evidence bags. When he placed them in the manila envelope, they were in the clear plastic bags that were sent off later for fingerprint analysis. What he says, and I have this in my reply brief, counsel says, now as far as people's exhibit number one, it came to us here in an envelope, an office-looking envelope with markings on it, correct? Yes, sir. And then subsequently, counsel says, did you place any of these evidence seals on here? This is my red evidence seal with my initials here, but if I remember it, I had placed it, the crack, in a plastic bag. Right, the crack. This is not the actual container that I placed it in. And do you know if he's holding one of the individual evidence bags at that point in time, the sealed evidence bag? I don't believe he is. You don't know? No, we don't know. But the context is people's exhibit number one, which is the manila envelope. Which includes five? Five of them, yes. Right, which are also in bags. Okay, go ahead. He placed the crack. To me, that implies that's all of it. If you were going to talk about having dispersed it into bags, you would say, actually, my understanding is he found these five bags as they were in the ruffles bag. Right. And did not take them out and repackage them or anything. That's my understanding, too. Okay, and then he says, I placed it, the crack, in a plastic bag. To me, that means all of it. What about the sixth bag? He doesn't talk about that. When they ask him where did this come from, he says he doesn't know. When Ms. Durker, the forensic, the lab person, is asked about it, she really doesn't know either. The best thing she can say is it seems to have come from the manila envelope that was supposed to be sealed until Trooper Hartman opened it on the day of trial. So did it have, do we know, did it have any initials on it? It was, I believe, it was entirely unmarked. That sixth bag that no one could explain. And we don't know whether it was checked for fingerprints either. That's a good question. No, I don't. It was not. I don't. And so it's not known when this bag materialized, for lack of a better word. At any rate, the Gibson case I cited, which is not factually identical, but the basic proposition of which is when there's a substantial discrepancy, that an explanation is warranted. And in this case, we have somewhat of a weight discrepancy, about 17.3 grams. It may or may not be explainable by whether some of these little plastic bags would have added up to the missing 17.3 grams. But the main thing is we have this rock of apparent crack cocaine. It's completely unlabeled, but shows up. So now we have six items instead of five. And the state, and the objection is made. And there's still a gap in the chain of custody in terms of the testimony presented where, in terms of who had control of it and what was done with it, both before, both after Mr. Hartman put it in a locker, until it was moved to a lab, and then after, from the lab to the court. The exhibits have a chart on the back of that first page. Were you present when these photographs were taken? No. No, I called the clerk and asked him to photocopy the front and back side. And you realized that there's no photograph of any sixth bag? I thought, you know, I don't actually, I either missed that or I don't remember if the clerk I spoke to told me about that. Well, maybe I should make myself clearer for the record. Yes. There is a picture of six bags. One is the evidence bag, the manila, and the other five are the plastic bags you refer to as the Illinois State Police evidence bags. I see. So you're saying it might be gone again? It would apparently be gone again. Okay. So you have no, nothing in the record to explain that? No, I appreciate your noticing that, Your Honor. I did not even notice, no. And like I said, I had asked him to copy all the bags. This could be speculation on my part. It's possible that she told me that she didn't copy a bag if there was nothing on it,  it was sort of an ordeal because she had to have a supervisor go with her and unlock, this is what she told me, unlock the vault so she could get access to the contraband to photocopy it. But the explanation in no way would be when there was a reference to a sixth bag, it was not the manila envelope. Yes, they said sixth bag with a rock of apparent crack cocaine in it. And it was, my understanding was also hand-knotted plastic bag. I don't know. And she is, Justice Pope is the one who noticed the sixth bag missing. At any rate, the State could have called whomever was in charge of the evidence, both before it was sent to the lab and after it came back from the lab. According to the list, there appears to be at least one person who was in charge of it after Mr. Hartman, Trooper Hartman put it in a locker and before it came to Ms. Durker at the lab, and then a different person later who eventually took it from wherever it was in the vaults and gave it to Mr. or Trooper Hartman just before trial. And it seems to me that when you have this unexplained bit of contraband, it calls into question whether or not this thing has been properly safeguarded or has not been tampered, and it at least calls for more evidence. It warrants an explanation. And so basically, on those grounds, request a new trial. I was going to, if there are no questions, I was going to stand on the third issue of my brief. No questions. Okay. Thank you, Mr. Ryan. Mr. Brooks? Excuse me, Ms. Brooks. I'm going to speak to someone else off the record. Carla, if you'd like to let our individuals go. Thank you very much. Please proceed, Ms. Brooks. Thank you, Your Honors. May it please the Court and Council, my name is Anastasia Brooks. I represent the people in this case. With respect to the sufficiency of the evidence, this is a far from perfect case in terms of the level of proof, but the question is whether it meets that lowest possible threshold for what constitutes proof beyond reasonable doubt. Considering, as this Court must in the context of an appeal, which is that the case has to be viewed in a light most favorable to the prosecution, and that includes taking all reasonable inferences from the record in the favor of the prosecution. Of course, unreasonable inferences cannot be allowed, so that gets into the question of what constitutes a reasonable inference on the record in this case. So there are some several key facts that explain what happened prior to the arrival of the police on the scene when the car was broken down and there was cocaine in bags in the trunk and the defendant had been the driver. And perhaps the most key fact is the fact that the defendant had been seen in Chicago before the start of this trip holding cocaine in bags. It doesn't have to be the same bags of cocaine that were recovered from the trunk because the state could have proven the defendant's guilt by accountability for a common design for having associated with the drug dealer, whose name is Wilson. And in furtherance of Wilson's activities in traveling south out of Chicago to sell drugs, if he had the common intent to aid or abet Wilson's drug dealing activities by serving as his driver because Wilson was unlicensed and had a history of using others to drive him, one person was named McCoy, had been unavailable this time. So the defendant being Wilson, the drug dealer's driver, it can be reasonably inferred that what he was holding prior to the trip was an opportunity for him to inspect what would be his payment for the trip. The defendant's brief makes this out as baseless speculation. The state calls it a reasonable inference. It seems to be an argument that occurs frequently in these sort of situations where there is, as the defendant says, it seems like there's a gap in the proof and the state's trying to fill gaps in proof by reasonable inference and the defendant then accuses the state of engaging in baseless speculation. So that is the question this Court has to consider. Are the inferences drawn in the state's brief reasonable inferences that trier fact could have used in deciding the defendant's guilt beyond reasonable doubt? Ms. Brooks, one of your inferences is that the defendant, well, two men are standing at the trunk when the trooper pulls up, and from that you infer he was trying to hide the cocaine. Did you look at the video of the arrest? I do not recall viewing the video. I'm not sure if I had that part of the record when I wrote my brief. Well, I looked at it and I was shocked to see that there's only one person standing at the trunk when the trooper pulls up and that the door of the automobile opens and the second person gets out after the trooper has arrived. I don't think you can draw any inference from the fact that apparently only one person is standing there. I don't know if it's the defendant because there's no evidence in the record. Nobody testified what that video shows. Well, it's not entirely clear in the sense that it could be theoretically possible that the police had been traveling from an opposite direction, seen them stalled on the side of the road and noticed two men outside the trunk. Is it possible? I'm not sure because I haven't seen the video. Essentially, if the video just shows the car approaching from behind and sees one person at the trunk at that point in time, it doesn't exclude the possibility that the trooper could have seen two people outside the trunk at a prior point in time, for example, if they had driven on, maybe returned, and then come back behind the vehicle. No. His camera's on. When he's pulling over, you see the trooper from the time he starts after he gets the dispatch. And he pulls in behind the car. It's a very short trip. And there's one person standing there. The other person gets out of the car after the trooper arrives. It's very clear on the video. Okay. I wasn't aware of what you're saying now. What you're saying is that there's actually a dispatch information received. That's the testimony. I don't recall any testimony to that record. You're saying it's on the videotape? No. Okay. The trooper testifies. He gets a call that there's a disabled vehicle. Okay. And he goes to the scene. His camera's on the entire time. This isn't a big point. I'm just trying to point out to you, one of the inferences you drew in your brief resulted from the trooper's testimony, which he did testify that there were two men standing outside the car. The video belies that. There were not two people standing outside of the car when he arrived. There was only one. And it's not clear if it's the defendant or the other guy. So I don't think you can draw an inference at all from that. And that was one of the inferences you drew in your brief. Well, I understand your point, Your Honor. Without actually having seen the video, I really can't respond any further than what I said about the possibility, if it is, in fact, a situation where the video forecloses all possibility and the trooper's testimony is positively rebutted by the videotape. Well, if that were, in fact, the case, then that would draw that off the table. But essentially, it doesn't really matter in the sense that there's still the proof of the driver, his defendant, he's driving for a drug dealer, he's got at least some cocaine prior to the trip. And so in those circumstances, there is also this haphazard placement. The fact it's in a ruffles bag, I think, also adds to the reasonable inference of, was this something that they were using to transport the drugs in at the beginning of the trip, or was it only placed in a ruffles bag because that's something that they had handy the moment the car breaks down, and then if there was a need then at that point to put the cocaine somewhere where it probably wouldn't likely be detected, for example, hidden in the trunk lining, there was some evidence where they talked about getting out of the car, going to McDonald's. If that was their plan, they might not want to carry all this amount of cocaine with them, particularly if they're stranded in the middle of the interstate. So it can be inferred, reasonably inferred, that the ruffles bag was actually part of some haphazard placement in the trunk, and the fact that at least, according to the video, as you say, Your Honor, there is one person outside the trunk who could be inferred as putting that in. I'm not sure if they could have seen a police officer coming and decided at that point to get rid of, I mean, to put the drugs in the trunk at that point. So it's not entirely clear, but at least reasonable inferences can be made about what happens apart from what was actually testified to, and the fact that that's not evidence in the same sense of a fact being testified to by a witness doesn't mean that this court cannot use it as part of deciding whether there was sufficient proof, because reasonable inferences can be considered in weighing the sufficiency of evidence. With respect to chain of custody, I'd like to point out that the defendant primarily, and I'm not entirely sure on the record, was preceded exclusively on the objection of the fact that there was a stray rock in the bag that was placed in there, and now on the appellate brief there are several more objections with respect to the failure to call who could have been Trooper Stafford, who's D. Stafford, which his initials or name appears on the label, as somebody else who was involved in the chain of custody but wasn't called by the prosecution. And the forfeiture is important here because, particularly with respect to chain of custody and foundation issues, the failure to object below would have given, if there had been an objection, would have given the state an opportunity to call that witness or explain, for example, the dispute here on appeal, which is who generated the manila envelope. Trooper Hartman's initials are on a seal, but yet there's some, it's not entirely clear from the record because there's no objection to that particular deficiency, alleged deficiency in the foundation below. Well, the trial judge recognizes there's a deficiency. A deficiency in? In the chain of custody. He allows the state to reopen and ask more questions. With respect to one part of the chain of custody, and I believe the state's case cited the fact that each particular objection to the chain of custody has to be raised below, not just, well, because they mentioned about the stray bag, now all of a sudden they haven't forfeited all additional grounds for objecting to chain of custody, that is, failure to call Stafford, et cetera. All of the other issues that are now raising for the first time on appeal, the state didn't have notice that they were objecting on those basis. Well, the state's burden to establish a primary patient case, isn't it? It is, Your Honor, and the state had done so by showing that substitution was improbable because the reasonable protective measures were taken, such as the labels that were placed on the manila envelope because of the seals that were placed on there by Hartman and by the evidence technician at the lab, and by the fact that it was stored in a secure vault at the police station and at the lab. Who testified to the procedures used by the Illinois State Police for securing evidence? Where in the record is that? I'm not sure. I thought that Hartman testified putting it in a vault. I think there was a reference to a vault. Right? I'll grant you that. But what about the routine procedures of Illinois State Police with respect to handling evidence? Who testified about that? Well, one thing that's in the record is there is a label which discloses who had access to the evidence between the time in which Hartman dropped it off in the vault and... Who testified to that? Who testified to every person who took it out of the vault? Well... Who explained? In fact, they asked the crime lab person, and she says, that's the submitting agency, I don't really know who any of those people are. And then nobody asks anybody from State Police, who are these people that handled the evidence? They could have asked Hartman. They didn't. Well, the chain of custody doesn't have to be perfect. It just has to be... there has to be a prima facie case. And the fact that the exhibit was admitted to evidence, the exhibit has a label on it, and the defense didn't make any sort of objection to hearsay, so there's nothing that would prohibit this court from considering the information on that label, and there was a case that the defendant cites about... Well, the label means nothing to us. Howard, I believe, was the case cited by the defense, and in which they said in that case whether the state could have supplemented the record with the information that was contained on the label. They failed to do so in Howard, and they said, Well, in that circumstance, there's cryptic testimony about what was on the label. We don't have a label in the evidence. It wasn't submitted on appeal, so the appellate court was stuck with an inadequate record. Right, but we have no testimony about what appears on the label. The label is on... I understand it's on a manila envelope, but nobody testifies to what it shows or what it means. We have to guess about that. Well, the information on the label speaks for itself. It shows that D. Stafford was the person who had access to the evidence between the time it was removed from the vault and the time it was transported to the state crime lab, and the fact that the defense can object to the failure to call Stafford is forfeited. Ms. Brooks, tell me this, if you know the answer. Who put the information on the label? Who put the individual hand-knotted baggies of crack cocaine into the self-sealed Illinois State Police evidence bags that are inside the manila envelope? Who did that? I'm trying to remember from the record. I know that, I thought it, Durker, the crime lab technician, testified that she repackaged some evidence, and I'm not sure if that was... She self-sealed the individual pieces of crack cocaine that she tested. She heat-sealed those and put them back into the Illinois State Police evidence bag. What I'm talking about, these bags that are unlabeled in the manila envelope, obviously these weren't what the hand-knotted baggies were found in, in the defendant's vehicle, right? These are Illinois State Police evidence bags. Right. Who put the crack cocaine in these individual evidence bags? That's my question to you. What does the record show? I don't remember what the record shows on that point, but that doesn't mean the record doesn't have any pertinent information with respect to that question. I just don't remember at this point. We have looked at that and cannot find it. I also have another question. According to the lab report where they checked for fingerprints, there were two additional baggies. One was the ruffles bag, and then one apparently contained plant material. Well, both of them actually contained plant material. 2A3 and 2B3, is that correct? I'm not sure about the plant material. Are they referenced anywhere at trial in the transcript? No, because he wasn't charged. He wasn't charged with cannabis possession. I don't think so. There was an exhibit that was the ruffles bag that apparently contained no other bag, correct? The ruffles bag initially, my understanding from reading the record is that the ruffles bag initially contained five plastic bags that each contained individual hand knotted baggies of crack cocaine. And it was those five plastic bags that were submitted for latent print analysis. What was the ruffles bag marked as in the record? People's Exhibit 5, I think. I think it's People's Exhibit 5. Well, with respect to the chemist's opinion, which was based on the sub-exhibits which were actually weighed, the ones that have been individually identified, those came from the sealed manila envelope, which originated with Illinois State Police, had been seized from the defendant, the label identifies, the mile marker, the time, the date, I believe the time as well, but at least the date, it lists the names of the suspects. And so it connects up with what the State Police is testing. And so when the State Police chemist testifies, well the straight piece doesn't change my conclusion, it's because the straight piece wasn't tested. Only the sub-exhibits were tested, the ones that totaled I believe 15.2 grams had been tested and weighed. So those constitute the basis for her opinion. So therefore, the defendant's only argument is, well the straight piece somehow constitutes some sort of evidence of substitution or tampering with the manila envelope itself, prior to the time that some bags of crack cocaine are pulled out by the State Police chemist and tested. So it doesn't, however, refute the basis for her opinion. So although there may be that one identified deficiency and others which were forfeited by the defense, chain of custody doesn't have to be perfect and the fact that there was one stray bag of crack cocaine doesn't establish that the State failed to prove that substitution had been improbable and it took reasonable protective measures to prevent that. So I do want to distinguish Gibson. In Gibson there was a marked increase in the weight of the cocaine between the time of the police seizure and the time in the lab. That constitutes actual evidence of substitution because there's no possible way for the prosecution to account for that. So this is a different situation where the weights were tested, one partially on a net basis in the lab, and the weight at seizure had been higher. So as the defense says here at the argument, it may or may not explain. So it's not the same situation in Gibson where there was no possible explanation other than substitution or tampering for why there was a substantial weight discrepancy in Gibson. So therefore Gibson is distinguishable, does not control the sufficiency of the chain of custody in this case. Ms. Brooks, what about the Howard case where the 2nd District said using a case identifying number is important in these types of cases? What I'm getting at is the 5 self-sealed Illinois State Police evidence bags are not marked in any way by the trooper or by trooper's staffer if he was the one who handled them. There's no case identifier on those bags. There's nothing except Michelle Durker's initials after she receives them at the crime lab. Except that the seal is on the manila envelope. It was labeled by Hartman. It was not opened by anyone else until it got to the lab where Durker testifies that she opens it up. Wait a minute. Wait a minute. You said it was sealed by Hartman and nobody else opened it? What are Stafford's initials doing on the manila envelope? His initials are on the... I'm trying to remember what his initials were on. They're on the manila envelope at the top of the evidence seal. It looks like there's two evidence seals on the bag, one over the other. I don't have enough information. Would you like to step up and look at the document? I'm almost out of time. I just want to make the point though that the seals and the handling were sufficient for reasonable protective measures and whatever deficiencies they identify are not as significant enough to defeat a crime patient case. And I have no further argument. Thank you, Your Honor. Thank you, Ms. Brooks. Mr. Ryan? Thank you, Your Honor. Concerning the first issue about the sufficiency of the evidence, the State referenced a fact about Mr. Wilson, co-defendant, having a history of using others to drive. Actually, there's nothing in the record to support that. What the evidence shows is that he used to go all the time with a guy named McCoy. There's no mention of anyone else or of any history, and the record is plain that this is Mr. Jackson's first trip, so says the State's witness. So I don't know how, without any evidence to that effect, that you can impute any knowledge of prior trips to Mr. Jackson. The other thing I wanted to mention about the sufficiency of the evidence is the idea of the ruffles bag being a last-minute way of covering up. And again, as Your Honor noted, while the record does not say who called the police, I believe Trooper Hartman says he was dispatched, implying that somebody called the police. And we don't know, but if you ever stole a car in I-55, it seems fairly likely that the police are going to arrive at some point, unless you can immediately take care of the problem yourself. And the idea that they needed to hurry up and hide this is not part of the record. But I think perhaps more to the point, why not ask Ms. Taylor, who's in the car and the State's witness? Instead of relying on reasonable inferences from questions that were not asked by the State, the State could have asked them, did one or both of these guys, apparently one of them or which one of them, get out of the car to hide the drugs after the car stalled? Do you think that Fareed Jackson knew about the drugs, and if so, why? The State can't say that what is basically a suspicion, a reasonable suspicion, is a reasonable inference of guilt. The idea that being in Chicago, in a room, with eight small bags of crack cocaine, and there's nothing about who brought them, what was done with them, somehow imputes knowledge beyond a reasonable doubt that by one, that the other has 300-something bags, little bags, hidden in his car. Concerning the second issue, the forfeiture, your Honor has pointed out that Trooper Hartman's initials are on the manila envelope. So at this point, I'm willing to concede that either I misread his testimony, or he was mistaken that he in fact did generate the manila envelope. If his initials are on the outside of it, it seems implausible that he didn't generate it. And it is true that counsel objected consistently about the unexplained rock, an unlabeled rock of cocaine that materialized in this envelope. There was the State's opportunity there to call and present additional evidence to fix it, and they didn't. So the State argues now that failure to complain about a weight discrepancy, or who generated the manila envelope, would have given them a chance to fix it. Apparently, the main thing, the main problem, again, is this unexplained rock, and that was objected to. I also think that the weight discrepancy, which maybe can be explained and maybe not, at the very least doesn't help the State. Because in a normal case, you can point to a matching ID number, matching weights, and a matching number of items, and you don't need to call everybody who is in that chain, because everything is reasonably well matched up. In this case, we don't have a match. We have somewhat of a weight discrepancy, and we have this unexplained rock of cocaine. And then when that is objected to, the State doesn't call, and still has not explained why they didn't call Mr. Stafford, and or perhaps the other gentleman who gave the item back to Trooper Hartman just before trial. On a final note, as for the Gibson case, I acknowledge that this case doesn't involve a five-fold increase in the number, as did Gibson. I think the overarching point of Gibson is that where there is a substantial discrepancy, you know, in the exhibit over time, an explanation is warranted, and here none is provided. If there are no further questions? No questions. Thank you, Counsel. We'll take this matter under advisement and adjourn for the day.